## Case No. 15,423.

### UNITED STATES v. HUNT.

[2 Story. 120; [1] 4 Law Reporter. 371.]

Circuit Court, D. Massachusetts.  Oct. Term, 1841.

SEAMEN — PUNISHMENTS BY MATE — INTOXICATION OF CREW — MARINE INSURANCE.

1. The authority of the officers in a merchant-ship, to compel obedience and inflict punishment, is of a summary character, but is not of a military character.

2. The right of the mate or other officers of a ship to inflict punishment on the seamen, when the master is on board and at hand, can be justified only by the immediate exigencies of the sea service, or as a necessary means to suppress mutinous, illegal, or flagrant misbehaviour on the part of the seamen, or to compel obedience on the part of the seamen to orders, or other duties, which require prompt and instant action and interference on the part of the officers, and admit of no delay. In general, it is the duty of the officers to consult the master as to the infliction of punishment.

[Cited in Thompson v. Hermann, 47 Wis. 609, 3 N. W. 582.]

3. If the master of a vessel set sail on a voyage, with the crew in such a state of intoxication, as disables them at the time for the proper performance of the ship's duty, and any disaster arise therefrom; it seems, that any loss from that disaster would not be recoverable from the underwriters, under the common form of policies of insurance.

This was an indictment against [Zebedee] Hunt, founded upon the Crimes Act of 3d of March, 1825, c. 276, § 22 [3 Story's Laws, 2006; 4 Stat 121, c. 65], for assaulting with a dangerous weapon (viz. a cutlass) one Thomas Coombs, on board of the American brig called the Havre, within the waters of Massachusetts Bay, and the admiralty and maritime jurisdiction of the United States. Plea, not guilty.

At the trial the facts appeared to be as follows: The defendant (Hunt) was mate of the ship, and Coombs was a seaman on board. On the 19th of October, 1841, the brig sailed from the inner harbor of Boston bound on a voyage to Savannah. It appeared that the vessel sailed from the wharf at Boston in the afternoon, and was standing out to sea, having reached Nantasket Roads, when it became necessary to secure the anchors, and to heave to, for the purpose of discharging the pilot. Three or four of the crew had been intoxicated ever since they came on board, and had caused the pilot and officers a good deal of trouble; sometimes remaining below and refusing to come on deck. After reaching the Roads, the captain (Carpenter) gave orders to heave the brig to, and asked Hunt, where the rest of the men were. Hunt answered, that he had called them several times and they had refused. (One of the crew testified, that Hunt had called these men up and received very insolent answers.) The captain then called them up, and they answered, that "they'd be d—d if they would come un-

---

1 [Reported by William W. Story, Esq.]

til they were a-mind to." The captain then said, "I'll come down to you, then." The men answered, "Come down;" and upon Capt. C.'s stepping down a few steps, they held out their hands towards him, (as he testified,) in a threatening manner. He then went aft, but one of the men, Coombs, came up and followed him to his windlass end, and struck at him with his fist. The blow was spent, but reached the captain's breast. Capt. C. took up a handspike, but Coombs got it away from him. At this moment Hunt seized Coombs, but received from him a blow in the face, which gave him a black eye. Hunt then ran aft to the roundhouse, and came forward with his cutlass drawn, and the scabbard left behind. As he went forward, the pilot told him to be careful, how he used his cutlass. Up to this point there was no discrepancy in the testimony. It appeared, also, that it was rather squally, and there was a hail squall soon after the vessel came to anchor. Hunt then went forward and struck Coombs two or three blows with the flat of his cutlass (as all the witnesses agreed) over the head and shoulders. The captain, second mate and cabin-boy here testified, that after these blows the mate retreated, and Coombs followed him, striking at him with his fists and daring him; that they saw no blows given with particular force by the mate, but that Coombs seemed to be wounded in the melee and confusion of the mate's defence, and attempt to reduce him to obedience. The same witnesses testified, that the melee ended several feet further aft than it began. The rest of the crew testified, that after two or three blows with the flat of the cutlass, Hunt seized the weapon and brought it down several times, with great force, upon the sharp edge, upon the hands and wrists of Coombs, who was only attempting to defend himself. According to the evidence of the crew, Coombs stood between the windlass end and the bow of the long-boat, when Hunt first struck him, and was in the same, or nearly the same place, when the affair ended. The pilot did not see the fight, being on the other side of the boat. Some of the rest of the crew interfered, though it appeared that one of them took hold of Hunt just as he was first attacking Coombs, before he got his cutlass, but, as was admitted, with no hostile intention. Doctors Ayers and Otis testified, that the left wrist of Coombs was nearly cut off, the right hand and arm badly wounded, and that amputation of the left might be necessary, though there were hopes of saving it. The other facts in the case sufficiently appear in the charge of the judge.

R. H. Dana, Jr., for the prisoner, rested the defence upon the following grounds: The repeated and deliberate acts of disobedience, accompanied with insolent language, and finally with an attack upon the captain, constituted, or might have appeared to Hunt to constitute, a mutiny. The taking forcibly from the captain a weapon of defence, which he had seized, and the attack upon Hunt, when he came to the captain's aid, aggravated the case; and another of the crew taking hold of Hunt at the moment, from whatever motive, might, in the excitement, have reasonably given the prisoner a fear of a general mutiny. His striking with the flat of the cutlass several times, showed the moderation of his proceedings, and the fact, that Coombs met him unarmed, and neither retreated nor sought a weapon of defence would seem to be evidence of no violence on the part of Hunt. It should be remembered, too, that Coombs did not even retire to the forecastle, the proper place for a seaman. Although there should turn out to have been no mutiny in fact, yet if the state of things was such as, under the circumstances, might reasonably have led the prisoner to suppose, that there was a mutiny, he must be excused for acting under that supposition, if his acts were moderate and reasonable for a person honestly so supposing. In mutiny, revolt, &c. the maritime law permits, and if necessary, enjoins, the use of dangerous weapons. The master and officers must be their own protectors, and the protectors of the lives and property under their charge. If the prisoner came lawfully in possession of the dangerous weapon and then used it in a moderate, or, under the circumstances, excusable manner, he must be acquitted.

Franklin Dexter, Dist. Atty., admitted the right of an officer to use dangerous weapons, in cases of necessity; but there was no mutiny; no one interfered in behalf of Coombs; and Coombs was known to be drunk. There were the master, pilot, and the mates to manage him, and the vessel had not left the harbor, but might have come to, and sent up to town or made a signal for aid. There was no necessity for using the cutlass. Hunt asked for no aid from any one, and no one offered to help him, showing that there could have been no serious danger. Coombs was alone, unarmed and unsupported by any one. The pilot cautioned Hunt as to his cutlass. The wounds, as testified to by the surgeons, could not have been received by Coombs striking at Hunt. They must have been given by a downward and a strong blow. There is no sufficient justification for using a dangerous weapon, and inflicting therewith a severe and maiming wound. He must be found guilty of the offence.

STORY, Circuit Justice, in summing up the case to the jury, among other things said: There is no doubt in this case that the defendant, (the mate,) committed an assault with a dangerous weapon, (a cutlass,) upon Coombs (the seaman,) in the manner stated in the indictment; and, that the place where the offence was committed was within the admiralty and maritime jurisdiction of the United States, on board the brig Havre, owned by

citizens of the United States. The wounds inflicted by Hunt upon Coombs were exceedingly severe, and it will not be surprising, if it shall turn out, according to the suggestion made by Dr. Otis, that amputation of the right hand should become necessary, although he yet hopes, that it may not be required. Under such circumstances, the offence is clearly established, unless the infliction of these wounds with the cutlass was justified on account of some positive necessity really then existing, or on account of some supposed necessity, then honestly and reasonably believed to exist by the defendant, either justifiable or excusable in point of law. If there was no such necessity, then the act was unlawful, and the defendant ought to be found guilty. So, if there was any such real or supposed necessity, and yet the punishment was excessive, either in kind or degree, the same result ought to follow. It will be important, therefore, for the jury to examine the whole circumstances of the case with scrupulous diligence and care. And here I may say, that where facts, sufficient to constitute the offence are established prima facie by the evidence, the burthen of proof is upon the defendant himself to show, that such a real or supposed necessity existed, which either justified or excused the acts, unless so far, indeed, as the attendant circumstances in the evidence offered by the government, do, of themselves, go to establish such a legal justification or excuse. If the defendant fails to satisfy the jury that there was, in point of fact, any such legal justification or excuse from such a real or supposed necessity, or he leaves it in doubt, then their verdict ought to be for the government.

It is apparent from evidence, that the crew were, at the time when this affray occurred, in a state of intoxication, from the use of spirituous liquors. Under such circumstances, they could scarcely be said to be fit for the due performance of the ship's duty, and were in a state, which might readily lead to disobedience of orders, and even to a mutiny and revolt. The path of prudence, therefore, clearly was, on the part of the master and officers, to avoid, as much as possible, all undue causes of excitement. This seems to have been the notion of the master himself. Indeed it might, perhaps, have been well for the master to have remained in Nantasket Road, until the crew were, in a great measure, recovered from their intoxication, before he sailed on the voyage. And, I desire to say, that it may be a matter of great doubt, whether, if the master set sail on a voyage with a crew in such a state of intoxication as disables them, at the time, from the proper performance of the ship's duty, and any disaster arise therefrom, any loss from that disaster would be recoverable from the underwriters under our common policies of insurance. The ship, under such circumstances, could scarcely be deemed, in the sense of the law, seaworthy for the voyage.

In respect to the right of the mate and other officers of the ship to inflict punishment on the seamen, when the master is on board, and at hand, it can be justified only by the immediate exigencies of the sea service, or as a necessary means to suppress mutinous, illegal or flagrant misbehavior on the part of the seamen, or to compel obedience to orders or other duties, which require prompt and instant action and interference on the part of the officers, and admit of no delay. If the circumstances are not urgent and imperative, it is the duty of the mate and other officers to consult the master as to the infliction of punishment; for he, being in the command of the ship, is alone ordinarily intrusted with the regulation of the ship's discipline; and no other person has any right to inflict punishment without his express or implied sanction thereof. Cases indeed, may, and do often arise, where instant obedience to the orders of the mate is necessary; such as orders to take in sail in a sudden squall, or to cut away the rigging or spars, or to go aloft on a sudden and emergent duty, where the mate may instantly enforce obedience, by the application of positive force, and indeed of all the force required to produce prompt obedience. But, then, every such case is justifiable only from necessity, and the force so used is not so much a punishment as it is a means of compelling the performance of a pressing duty, admitting of no delay. One question, therefore, in the present case, is, whether any such necessity did exist, which either justified or required so harsh and severe a punishment. I must confess, that I have great difficulty in saying, that it is clearly made out by the evidence, and unless it is, the verdict of the jury ought to be against the defendant.

It is certainly true in this case, that the conduct of Coombs (the seaman) was of a grossly mutinous and improper character. The master, in his testimony, states, that when Coombs followed him on deck, he (the master) seized a handspike, not, (as he asserts,) with intent to strike Coombs, but to intimidate him. Coombs immediately struck him, (the master,) which was a most unjustifiable act, unless done in necessary self-defence, in order to repel an attack meditated by the master with the handspike, a weapon of great and dangerous power. The master says, that he did not return the blow, but put down the handspike; and immediately the defendant (the mate) came and took hold of Coombs. Coombs then struck the defendant, and gave him a black eye; upon which the defendant became greatly excited; and said: "I am not here to be pounded; give me my cutlass;" and immediately went into a house on the deck, at about thirty or forty feet distance, and got his cutlass, and came back and struck Coombs two or three blows with the back of the cutlass. Coombs was at that time holding up his hands, and making passes at the mate. After this the mate and Coombs closed. The master did not see the blows

struck by the mate with the edge of the cutlass; nor did he see Coombs take hold of the mate. Such is the substance of the master's testimony upon this point. He does not pretend, that he was under any immediate fear of other blows being struck upon himself by Coombs; nor did he in any manner authorize or require the interference of the mate in his defence. But that interference was a sudden impulse and voluntary act of the mate, without any call for his aid.

From the other evidence in the case, it is abundantly clear, that the blows inflicted by the mate upon Coombs, with the edge of the cutlass, were (as has been already suggested) exceedingly severe, and violent. Coombs's right hand was (as the physicians state) half cut off, the edge of the cutlass having cut directly through the bones of the writ, and divided the joint to the external muscles. Both of the arteries were cut off; and the wound bled profusely. The fleshy part of the left hand also had a deep gash cut across it; and the left thumb also was severely cut. There were, then, three large wounds; and it is as yet uncertain, whether an amputation of the right hand may not become necessary. The physicians also testify, that the wounds could not, in their judgment, have occurred by an attempt merely to ward off blows. There is a great deal of other testimony in the case by several of the crew, to establish, that Coombs did not attempt to strike the mate after he got the cutlass; but merely to defend himself; that he put up his hands to ward off the blows of the mate; and that the mate struck Coombs three times with the edge of the cutlass. On the other side, the second mate testifies, that Coombs struck the captain more than one blow, and that when the mate came with his cutlass, Coombs ran towards him, and the latter retreated five or six feet; that a scuffle then ensued; that he (the second mate) saw none of the blows struck with the cutlass; but he saw Coombs immediately afterwards bleeding. As soon as the affray was over, the defendant (the mate) helped to bind up the wounds of Coombs. The character of the defendant, for general humanity and moderation, is also testified to in a favorable manner. It is certainly difficult to reconcile the testimony of the second mate with that of the master. But the latter stands strongly confirmed by the testimony of the rest of the crew, as well as by that of the pilot, as far as he saw the transactions, and has spoken to the facts. It will be for the jury, however, to judge of the credibility of the witnesses, and to compare and weigh their testimony.

But, under all the circumstances, it appears to me, that the burthen of proof is upon the defendant, to establish by clear and determinate evidence, that the wounds thus inflicted upon Coombs (of the nature and full extent of which there is no controversy), were inflicted by the mate in justifiable self-defence, or on an occasion of some real, or supposed urgent necessity, admitting of no delay, and indispensable to the ship's service, such as I have already adverted to. Has such a case been made out? If it has not been made out, beyond any reasonable doubt, then the defendant ought to be pronounced guilty of the charge in the indictment. If it has been, then he ought to be acquitted. It will not be sufficient, for the defendant, to prove, that he had a strong cause of provocation, or that Coombs was acting in an unjustifiable manner, or was guilty of gross misconduct. He must go farther, and show, that the acts done by himself were, absolutely or apparently, required by the pressing exigencies of the occasion, and that in their character and degree, there was no excess beyond these exigencies. Seamen are not to be treated like brutes, simply because they misbehave themselves; neither has any officer of a ship a right to indulge his own passions or resentments, by inflicting upon them cruel, or harsh, or vindictive punishments. If he does, he is amenable to the justice of his country for his misconduct. Undoubtedly, the mate upon this occasion, acted under strong excitements. But he was bound by his duty, to circumspection and moderation; and, indeed, he had no right (as has been already intimated), while the master was present, to inflict any punishment upon the crew without his consent, unless there was some imperious necessity, which required instant action, and justified the use of the cutlass to the full extent and degree, in which it was used.

The learned counsel for the defendant has asked the court to direct the jury, that the officers of the ship are clothed, not merely with a civil, but with a military power, over the seamen on board. In my judgment, that is not the true relation of the parties. The authority to compel obedience, and to inflict punishment, is, indeed, of a summary character, but, in no just sense, of a military character. It is entirely civil; and far more resembles the authority of a parent over his children, or rather, that of a master over his servant or apprentice, than that of a commander over his soldiers. Properly speaking, however, the authority of the officers, over the seamen of a ship, is of a peculiar character, and drawn from the usages, and customs, and necessities of the maritime naval service, and founded upon principles applicable to that relation, which is full of difficulties and perils, and requires extraordinary restraints, and extraordinary discipline, and extraordinary promptitude and obedience to orders.

It has been also suggested, that the crew were in a state of mutiny; and that the immediate interference of the mate was necessary, to suppress it. But that does not seem to be made out by the evidence; for there is no proof, of any general disobedience by all the crew, or of any general combination and coöperation with each other, to resist orders, or indeed, of any thing but of mere tardiness and reluctance to go to work, probably in

some measure superinduced by intoxication. Nor am I able to perceive in the evidence, if believed, any distinct proofs that the wounds were accidental, or unintentional. On the contrary, all the witnesses, who speak directly to the point of the manner and circumstances, under which the wounds were inflicted, treat them as voluntary acts, and as not accidental or required in self-defence, or from any real, or apparent necessity. However, this is a matter of fact, upon which the jury will exercise their own sound judgments, in deciding upon the credibility of the evidence, and the conclusion to which it ought to lead them.

Verdict for the defendant, "not guilty."

UNITED STATES (HUNT v.). See Case No. 6,900.